IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

CATHERINE OJIAMBO       §
      §
v.       §      CIVIL NO. 4:25-CV-01295-SDJ-BD
      §
FREEDOM MORTGAGE       §
CORPORATION       §
      §

## MEMORANDUM OPINION AND ORDER

Pro se Plaintiff Catherine Ojiambo filed an Emergency Motion for Temporary Restraining Order ("TRO"), seeking to enjoin a foreclosure sale scheduled to occur the afternoon of March 3, 2026. (Dkt. #63). After considering the TRO application, Defendant's response, (Dkt. #68), Plaintiff's reply, (Dkt. #69), the record, and the applicable law, the Court concludes that Plaintiff is not entitled to the extraordinary remedy of a TRO.

## I. BACKGROUND

In November of last year, Plaintiff sued Defendant Freedom Mortgage Corporation, the servicer of the mortgage on her property, (Dkt. #1), and, concurrently with her original complaint, moved ex parte for a TRO, (Dkt. #2). That motion asserted that Defendant had scheduled a foreclosure sale of her home in six days. *Id.* The Court denied the motion because Plaintiff had failed to satisfy the notice requirement of Federal Rule of Civil Procedure 65(b)(1)(B) and sought relief under a federal law that does not authorize injunctive relief. (Dkt. #11). On the day the

1

foreclosure sale had been scheduled to occur, Plaintiff notified the court that Defendant had cancelled the sale the day before. (Dkt. #13).

The next day, Plaintiff amended her Complaint. (Dkt. #18). The operative Amended Complaint alleges violations of the Real Estate Settlement Procedures Act ("RESPA") and its implementing regulations and state-law claims, including one for breach of contract. *Id.* Plaintiff alleges that, after she became unemployed, she contacted Defendant and completed a hardship and loss-mitigation application. *Id.* at 2. She further alleges that, "[o]n the same date, [she] sent Defendant a written message confirming that she wished to be considered only for a loan modification and not for a refinance or any option creating a junior lien." *Id.*

Plaintiff alleges that, the next month, Defendant issued a "decision letter" and proposed modification agreement that offered one loss-mitigation option and indicated that several others were "unevaluated." *Id.*; *see* (Dkt. #70-1) (decision letter listing various "Program[s]" as "Un-Evaluated," "Non-Approved," "Approved," and "Eligible"). Plaintiff alleges that "Defendant failed to complete the FHA waterfall because it left multiple options unevaluated and proceeded directly to a single modification offer." (Dkt. #18 at 2).

Plaintiff alleges that she rejected that offer and insisted that Defendant evaluate other loss-mitigation options. *Id.* The next month, Defendant's online portal indicated that Plaintiff's application had been rejected for failure to provide documents, then switched to indicating that the loss-mitigation review remained ongoing, and then finally switched back. *Id.* at 3. Shortly thereafter, Defendant

noticed a foreclosure sale and Plaintiff submitted a notice of error objecting that Defendant's loss-mitigation review was incomplete. *Id.* She states that Defendant received the notice of error but never corrected the error or conducted a reasonable investigation. *Id.*

Plaintiff alleges that Defendant then flip-flopped again, indicating that her loss-mitigation application was "in progress" and calling to collect information "'in support' of loss mitigation" that Plaintiff alleges was irrelevant to her application. *Id.* at 4. At the time of the amended complaint, Plaintiff alleges that the originally noticed foreclosure sale had been cancelled but that "Defendant had not instructed [the substitute trustee] to permanently stop foreclosure." *Id.*

Plaintiff argues that Defendant's conduct violates RESPA because Defendant "fail[ed] to exercise reasonable diligence, fail[ed] to evaluate all FHA Home Retention Options, and issu[ed] a decision letter with multiple options marked 'unevaluated.'" *Id.* She explains that, in her view, Defendant engaged in "dual-tracking," *id.*, the prohibited practice of "actively pursu[ing] foreclosure while simultaneously considering the borrower for loss mitigation options." *Gresham v. Wells Fargo Bank, N.A.*, 642 F. App'x 355, 359 (5th Cir. 2016); *see* 12 C.F.R. § 1024.41(g) (generally prohibiting dual tracking).

Plaintiff's breach-of-contract claim is based on the allegation that the Deed of Trust incorporates RESPA's requirements and that seeking to foreclose on her property without complying with RESPA put Defendant in breach. (Dkt. #18 at 5; *see id.* at 4 (citing 12 C.F.R. § 1024.41(b), (c), (g)). The Deed of Trust (of which the court

3

may take judicial notice, *Smith v. MTGLQ Investors, L.P.*, 851 F. App'x 514, 514 (5th Cir. 2021)), provides that it "does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary [of the Department of Housing and Urban Development ("HUD")]," (Dkt. #69-1 at 5 (Denton Cnty., Tex., Prop. Recs., Doc. No. 2016-69774, at 5 (June 14, 2016)).

In her TRO application, Plaintiff claims a likelihood of success on the merits of her breach-of-contract claim premised on the allegation that "foreclosure was pursued while required loss-mitigation evaluations were incomplete and while error-resolution obligations remained outstanding." (Dkt. #63 at 2; *see also* Dkt. #69 at 6 (stating that "[t]he TRO does not depend on the [second] amended pleading being operative")). She attached a copy of Defendant's notice of foreclosure (Dkt. #63-1 (Denton Cnty., Tex., Prop. Recs., Doc. No. 2026-03/014)), which is also a public record of which the court may take judicial notice. She states, and the notice of foreclosure indicates, that Defendant has scheduled a new foreclosure sale to occur on March 3, 2026, no earlier than 1:00 p.m. (Dkt. #63-1 at 1).

## II. LEGAL STANDARD

A TRO is "an extraordinary and drastic remedy." *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009) (citation omitted). TROs "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters Loc. No. 70*, 415 U.S. 423, 439, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974); *see also Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 829

(5th Cir. 1976) (explaining that "the office of a temporary restraining order is to preserve, for a very brief time, the status quo, so as to avoid irreparable injury pending a hearing on the issuance of a preliminary injunction").

There are four prerequisites to the entry of a TRO or preliminary injunction. The movant must demonstrate "(1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest." *Affiliated Pro. Home Health Care Agency v. Shalala*, 164 F.3d 282, 285 (5th Cir. 1999); *see Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) (noting that the standards for TROs and preliminary injunctions are the same). A party seeking injunctive relief must "unequivocally show the need for its issuance," *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997), by introducing sufficient evidence to justify the granting of a preliminary injunction or TRO, *PCI Transp. Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 546 (5th Cir. 2005). The movant must prove each of the four elements before injunctive relief can be granted. *See Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). The decision to grant or deny a TRO lies within the court's discretion. *Id.*

### III. DISCUSSION

#### A. Likelihood of Success on the Merits

Plaintiff bases her application for a TRO on her breach-of-contract claim, (Dkt. #63 at 2), so she must show a substantial likelihood of success on the merits of

that claim. To state a claim for breach of contract under Texas law, a plaintiff must allege that "(1) a valid contract exists; (2) the plaintiff performed or tendered performance as contractually required; (3) the defendant breached the contract by failing to perform or tender performance as contractually required; and (4) the plaintiff sustained damages due to the breach." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019). Plaintiff has not demonstrated a substantial likelihood of prevailing on each of those elements.

### 1. The existence of a valid contract and Plaintiff's damages

The first and fourth elements are straightforward. The Deed of Trust is a contract sufficient to support a breach-of-contract claim, *Williams v. Wells Fargo Bank, N.A.*, 884 F.3d 239, 244 (5th Cir. 2018) (noting that, under Texas law, a claim for breach of a deed of trust is a breach-of-contract claim), and Plaintiff has shown at least a "reasonable probability" that Defendant will foreclose on her home in alleged violation of the Deed of Trust, *MCI Telecommunications Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 654–55 (Tex. 1999) (explaining that a plaintiff may recover in breach of contract for injuries that there is a "reasonable probability" she will incur); *see Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993) (holding that a temporary injunction is appropriate in a breach-of-contract case "if the applicant establishes a probable right on final trial to the relief sought, and a probable injury in the interim").

### 2. Plaintiff's performance

Ordinarily, "a party to a contract who is h[er]self in default cannot maintain a suit for its breach." *Cruz v. Compu-Link Corp.*, No. 2:22-cv-00243, 2023 WL 4543584,

at \*5 (S.D. Tex. May 9, 2023). Here, Plaintiff does not dispute that she was in default of her duty to "pay when due the principal of, and interest on, the debt evidenced by the Note." (Dkt. #69-1 at 2; *id.* (defining the "Note" as the "note dated the same date as [the Deed of Trust], which provides for monthly payments, with full debt, if not paid earlier, due and payable on July 01, 2046")). But the Fifth Circuit has explained that there are several exceptions to that general rule. *Williams*, 884 F.3d at 244. "One of these exceptions is that a party's default under a contract will only excuse the other party's performance of the contract's terms that are dependent upon the promises that the defaulting party failed to perform." *Id.*

*Williams* involved a servicer's duty under a deed of trust to provide certain notices to the borrowers before foreclosing. *Id.* at 245. That obligation "was independent of the [borrowers'] agreement . . . to pay monthly installments to satisfy the debt" because it "would not even arise unless and until the [borrowers] were in default." *Id.* Because "Texas courts 'must . . . attempt to give effect to all contract provisions so that none will be rendered meaningless,'" provisions that can take effect only after a borrower's default are exempted from the borrower's usual duty to show that she was not in default. *Id.* (quoting *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998)).

Here, Plaintiff alleges that Defendant breached the Deed of Trust by taking steps to foreclose before it had satisfied its duties under RESPA even though the Deed of Trust prohibits foreclosure in that circumstance. The provision of the Deed of Trust incorporating RESPA governs acceleration of the loan and foreclosure, which the

Deed of Trust allows only when Plaintiff is in default. (Dkt. #69-1 at 4–6). The prohibition on foreclosures or accelerations when prohibited by HUD would not come into play until foreclosure or acceleration is otherwise authorized by the Deed of Trust—in other words, after Plaintiff's default. That duty is therefore independent of Plaintiff's duty to make payments on her debt. The relevant performance is Plaintiff's duty to file a complete application for loss-mitigation review in order to invoke RESPA. *See* 12 C.F.R. § 1024.41(b)(1). Because Plaintiff alleges that she "completed a hardship and loss-mitigation application," (Dkt. #18 at 2), she satisfies that element at this stage.

### 3. Defendant's breach

"Federal statutes and regulations can form the basis of a breach-of-contract claim if the parties expressly incorporate them into their contract." *Smith v. JPMorgan Chase Bank, N.A.*, 519 F. App'x 861, 864 (5th Cir. 2013). Plaintiff alleges that Defendant breached the Deed of Trust by moving to foreclose on her property when not permitted by RESPA and its implementing regulations. That makes her breach-of-contract claim dependent on a showing that Defendant was not permitted to foreclose by HUD regulations. *See* (Dkt. #69-1 at 5.)

12 C.F.R. § 1024.41 subjects mortgage servicers to several requirements related to "loss mitigation application[s]." Subsection (b) requires a mortgage servicer, if it receives a loss-mitigation application from a borrower before a foreclosure sale, to "review the loss mitigation application to determine if the loss mitigation application is complete" and "[n]otify the borrower in writing within 5 days

8

(excluding legal public holidays, Saturdays, and Sundays) after receiving the loss mitigation application that the servicer acknowledges receipt of the loss mitigation application and that the servicer has determined that the loss mitigation application is either complete or incomplete." Subsection (c) requires servicers to "[e]valuate the borrower for all loss mitigation options available to the borrower" and "[p]rovide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage."

> Titled "Prohibition on foreclosure sale," subsection (g) provides:

> If a borrower submits a complete loss mitigation application after a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process but more than 37 days before a foreclosure sale, a servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale, unless:

>> (1) The servicer has sent the borrower a notice pursuant to paragraph (c)(1)(ii) of this section that the borrower is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied;
>> (2) The borrower rejects all loss mitigation options offered by the servicer; or
>> (3) The borrower fails to perform under an agreement on a loss mitigation option.

*See* 12 C.F.R. § 1024.41(h) (describing the appeal process).

Plaintiff alleges that she submitted a loss-mitigation application, but Defendant's decision letter proposed one loss-mitigation option and indicated that others were "unevaluated." (Dkt. #18 at 2). Although Defendant was not required to offer any particular loss-mitigation option, 12 C.F.R. § 1024.41(a), it was required to

evaluate "all loss mitigation options available." *Id.* § 1024.41(c)(1)(i); *see Engle v. Carrington Mortg. Servs., LLC*, No. 3:19-cv-101, 2020 WL 4505900, at *4 (N.D. W. Va. Aug. 5, 2020).

Plaintiff, however, does not identify which loss-mitigation options were "available" within the meaning of that provision, much less show that any of the options that Defendant indicated were "Un-Evaluated," (Dkt. #70), were among the options available to her. As a Consumer Financial Protection Bureau guide explains, the "loss mitigation options available to the borrower" within the meaning of § 1024.41(c)(1)(i) "include only those programs available from the borrower's lender for which the borrower qualifies." ¶ 30-269 CFPB Guide to the Mortgage Servicing Rules Housing Counseling Requirements, Mortgage Compl. Guide P 30-269 n.112 and accompanying text (footnote omitted) (citing 12 C.F.R. part 1024, Supplement I, Comment 41(c)(1)–(2)).

Stated differently, the word "available" in § 1024.41(c)(1)(i) limits the scope of the duty that provision establishes. The Bureau's relevant final rule explained that

> [t]he loss mitigation options available to a borrower are those options offered by an owner or assignee of the borrower's mortgage loan. Loss mitigation options administered by a servicer for an owner or assignee of a mortgage loan other than the owner or assignee of the borrower's mortgage loan are not available to the borrower solely because such options are administered by the servicer.

Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10696, 10896 (Feb. 14, 2013); *see id.* at 10827 (finding "the requirements in § 1024.41(c)(1) to evaluate a loss mitigation application for all loss mitigation options available to the borrower . . . not inconsistent with a

determination by an owner or assignee of a mortgage loan to evaluate a borrower for loss mitigation options by using a 'waterfall' method," which "is simply an evaluation rule"). Again, Plaintiff has not even shown what options Defendant administers, much less what options the owner or assignee of her loan offered, so she has not met her burden to establish a likelihood of success on a claim premised on Defendant's alleged failure to evaluate one or more of those options. *See also* 12 C.F.R. § 1024.41(c)(1)(ii) (requiring a servicer to "[p]rovide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage"—not to notify the borrower of which loss mitigation options are "available," *id.* § 1024.41(c)(1)(i)); *Bennett v. Bank of Am., N.A.*, 126 F. Supp. 3d 871, 884 (E.D. Ky. 2015). And she admits that she rejected the loss mitigation option that Defendant offered her. (Dkt. #18 at 2); *see* 12 C.F.R. § 1024.41(g)(2).

Nor has Plaintiff shown a likelihood of success on her breach-of-contract claim to the extent it is premised on an alleged violation of § 1024.35(e)(1). That provision requires a mortgage servicer that receives a "notice of error" from a borrower to respond either by "[c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction" or "[c]onducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred." *See id.* § 1024.35(a) (defining a "notice of error" as a written notice from a borrower that asserts an error and contains information identifying the borrower, the loan, and the

error); *id.* § 1024.35(b)(10) (defining an "error" as, among other things, moving for or conducting a foreclosure sale in violation of 12 C.F.R. § 1024.41(g)); *id.* § 1024.35(e)(3)(B) (providing that, when an error is based on § 1024.35(b)(10), the servicer must comply with § 1024.35(e)(1) "[p]rior to the date of a foreclosure sale or within 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the notice of error, whichever is earlier").

On this point, Plaintiff alleges that she submitted a notice of error to Defendant based on its failure to comply with RESPA but that Defendant did not correct the alleged error or reasonably investigate it. (Dkt. #18 at 4–5). But again, Plaintiff does not show that Defendant's alleged error was, in fact, an error, and she also does not establish a likelihood of being able to show that Defendant did anything wrong under the regulations. She alleges that she submitted a notice of error that "identified failures to evaluate FHA options, conflicting communications, and improper foreclosure posting." Dkt. 18 at 3. But she has not attached or pointed the Court to evidence demonstrating that Defendant failed to reasonably investigate her notice of error.

To the contrary, the record shows that, three business days after Defendant acknowledged receipt of the notice of error, (Dkt. #12-3), its representative contacted Plaintiff stating that she intended to verify details regarding Plaintiff's loss-mitigation application, (Dkt. #12-2 at 1). The next business day after that, Defendant cancelled the scheduled foreclosure sale. (Dkt. #13). Rather than supporting

Plaintiff's allegation that Defendant did not reasonably investigate her notice of error, that evidence could reasonably support the inference that it did.

In short, Plaintiff has not established that she is likely to prevail on the merits of her breach-of-contract claim, the sole claim on which her TRO application is based. *See* (Dkt. #63 at 2). That means she is not entitled to the extraordinary remedy of a TRO. *See Anderson*, 556 F.3d at 360; *Affiliated Pro. Home Health Care Agency*, 164 F.3d at 285.

## B. Remaining Factors

When a TRO applicant establishes a substantial likelihood of success on the merits, the Court must consider whether she has also established the remaining three elements. *See Affiliated Pro. Home Health Care Agency*, 164 F.3d at 285. But when, as here, the first element has not been satisfied, no further analysis is required. *See Sharing Servs. Glob. Corp. v. Oblon*, No. 4:20-CV-989-SDJ, 2021 WL 3410670, at *2 (E.D. Tex. Jan. 8, 2021).

## IV. Conclusion

It is **ORDERED** that Plaintiff Catherine Ojiambo's Motion for a Temporary Restraining Order, (Dkt. #63), is **DENIED**.

**So ORDERED and SIGNED this 3rd day of March, 2026.**

_____
SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE

13